UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-80556-CIV-MARRA

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

Plaintiff,

vs.

JANET PRUSHANSKY, as Personal
Representative of the Estate of Ann Prushansky,

Defendant.
_____/

JANET PRUSHANSKY, as Personal
Representative of the Estate of Ann Prushansky,

Defendant/Counter-Plaintiff,

vs.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

Plaintiff/Counter-Defendant,
_____/

## OPINION AND ORDER

This cause is before the Court upon Defendant Government Employees Insurance

Company's ("GEICO") Amended Motion for Summary Judgment (DE 69); Defendant/Counter-

Plaintiff's Motion for Leave to File Supplemental Authority (DE 87) and  Defendant/Counter-

Plaintiff's Motion for Leave to File Supplemental Authority (DE 89).  The Court has carefully

considered the motions and is otherwise fully advised in the premises.

I. Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom in a light most favorable to the non-moving party, for the purpose of this motion, are as follows:

GEICO issued an automobile policy, policy number 0142962604 to David Fradley effective March 12, 2008 to September 12, 2008. The policy provided Bodily Injury Liability ("BI") coverage in the amount of $100,000.00 per person and $300,000.00 per accident. (Policy, Ex. 1, DE 70.) GEICO's fiduciary duty to act in good faith and in the best interests of its insureds is non-delegable. (Michael Gillion Dep. 14-15, Ex. 42, DE 70.)

On June 10, 2008, Tara Fradley ("Tara"), the seventeen year old daughter of David and Mary Fradley, was involved in a six-car accident on Interstate 95 in Boynton Beach, Florida. (Florida Traffic Crash Report, Ex. 2, DE 70; Florida Highway Patrol Traffic Homicide Investigation, Ex. 3, DE 70.) As Tara was entering the Boynton Beach Boulevard exit ramp, she collided with the rear-end of a vehicle driven by Ann Prushansky. Tara's collision with Ann Prushansky caused Ann Prushansky to collide with a vehicle driven by Lonnie Hickman, which caused Hickman to impact a vehicle driven by Summer McKnight. As a result, McKnight struck a vehicle driven by Reus Pierre, who then struck a vehicle driven by Vera Rey Beach. (Florida Traffic Crash Report.)

Ann Prushansky died as a result of the collision. (Florida Traffic Crash Report.) Several other individuals involved in the accident, including Hickman, McKnight, Pierre and Tara's passenger, Jayme Seitter, sustained injuries as a result of the collisions. Although Tara was not cited for the accident, a toxicology report eventually revealed that at the time of the accident,

Tara was under the influence of alcohol and Alprazolam (Xanax). (Probable Cause Affidavit, Ex. 4, Ex. 70.)

The accident was reported to GEICO the same day by Tara's parents.  The Fradleys advised GEICO that Tara hydroplaned into stopped traffic and that there were multiple injuries and one fatality.  GEICO began its investigation and sent a field representative to obtain a copy of the accident report.  GEICO further confirmed that the accident involved a fatality. (Activity Log, Ex. 5, DE 70.)

On June 11, 2008, the day after the accident, GEICO mailed its insured, David Fradley, a letter advising him that the accident had resulted in at least one BI claim, which exceeded his BI coverage limits.[1] (June 11, 2008 BI letter, Ex. 6, DE 70; David Fradley Dep. 20-21, Ex. 7, DE 70.)  The letter also stated that there was a possibility of an excess judgment and advised him that he had the right to seek independent counsel to protect his interests in excess of the policy limits. (June 11, 2008 BI letter.)  GEICO also called Mr. Fradley. (Activity Log.)  Additionally, on June 11, 2008, GEICO attempted to reach out to Ann Prushansky's family, offering condolences and requesting they contact GEICO regarding the claim.  (June 11, 2008 letter from GEICO to Harvey Prushansky, Ex. 9, DE 70.)  GEICO then discovered that Tara had retained attorney Bill Tunkey. (Activity Log.)  Tunkey advised GEICO that a criminal investigation was ongoing and that law enforcement had drawn Tara's blood at the scene.  GEICO advised Tunkey of the amount of the subject policy limits.  (Activity Log.)

Defendant/Counter-Plaintiff Janet Prushansky, as personal representative of the estate of

---

[1] A similar letter was sent regarding property damage limits. (June 11, 2008 Property letter, Ex. 8, DE 70.)

Ann Prushansky, retained attorney Kenneth Metnick. (Janet Prushansky Dep. 12, Ex. 10, DE 70.)
GEICO received a faxed letter from Metnick, demanding certain insurance disclosures, "the
policy limits," and any policy limits of "excess/umbrella coverage."  The letter also requested
copies of all photographs and repair estimates of vehicles.  Further, the letter instructed GEICO
to take measures to insure that the vehicles involved in the accident were not altered or sold.
(June 13, 2008 letter from Metnick to GEICO, Ex. 11, DE 70.)   In response, GEICO requested
clarification of a portion of the letter and enclosed an affidavit of coverage and advised it ordered
a certified copy of the policy, which would be forwarded to Metnick. GEICO also sent a copy of
this letter to David Fradley. (June 16, 2008 letter from GEICO to Metnick, Ex. 12, DE 70.)

On June 17, 2008, GEICO called David Fradley and requested information regarding who
signed Tara's driver's license application. GEICO also asked Mr. Fradley whether he had any
other insurance coverage.  On that same date, Metnick's office called and advised GEICO they
planned on making a written demand for $100,000.00 for the Estate and $100,000.00 in medical
expenses because Ann Prushansky died at the hospital, not at the scene of the accident. One hour
later, Metnick's office advised they were seeking $300,000.00.  GEICO adjuster Kelly Killick
stated that the BI limits were only $100,000 per person. (Activity Log.)

GEICO drafted affidavits for both Tara and her parents to sign. (Activity Log.)  On June
18, 2008, GEICO mailed a certified copy of the policy to Metnick. (June 18, letter, Ex. 13, DE
70.)   On June 19, 2008, GEICO forwarded to Tara, Mary and David Fradley letters updating
them on the claim and enclosing a copy of the Estate's demand letters.  GEICO advised, among
other things, that the Estate was demanding $300,000.00 to settle the claims but that the subject
policy would only cover $100,000.00 of such amount because the per person limits were only

4

$100,000.00.  GEICO further advised that Metnick had demanded the amount be paid on or before July 13, 2008 and Metnick would not settle the case unless he received an affidavit of no other insurance.  GEICO warned of the possibility of an excess judgment and advised of the Fradley's right to contribute the additional $200,000.00 to settle the claim. GEICO also advised the Fradleys of their right to seek independent counsel to advise on the protection of their assets. (June 19, 2008 letter from GEICO to Tara, Ex. 14, DE 70; June 19, 2008 letter from GEICO to Mary Fradley and David Fradley, Ex. 15, DE 70.)  On June 19, 2008, counsel for the Estate sent GEICO a letter requesting to take the statements of Tara, David and Mary Fradley.  The letter also included a request for the disclosure of all vehicles in the Fradley household, the name of the owners of all vehicles and all related insurance information, including homeowner's insurance information.  (June 19, 2008 letter, Ex. 16, DE 70.)   GEICO responded that it had forwarded Metnick's request to its insured for consideration. (June 20, 2008 letter, Ex. 17, DE 70.)

On June 20, 2008, GEICO sent a letter to attorney Bart Cozad which stated, "We would like to retain your services to provide a defense to our insured."  The letter also asked for assistance with meeting Metnick's request.[2] (June 20 2008 letter, Ex. 18, DE 70.)  On the same day, GEICO wrote a letter to the Florida Department of Motor Vehicles, requesting the information Metnick sought regarding who signed Tara's driver's license application. (June 20 letter from GEICO to DMV, Ex. 19, DE 70.)  That same day, GEICO received a letter from Metnick which confirmed that the Estate was demanding $300,000.00 to settle the claims. Metnick indicated that the demand was for "the estate, medical bills, funeral bills, mental

---

[2] Cozad testified that he represented both the Fradleys and GEICO and assisted GEICO in carrying out the duty of good faith. (Cozad Dep. 18-19, 40, Ex. 34, DE 70.)  Cozad was in constant communication with GEICO. (Killick Dep. 48, Ex. 36, DE 70.)

anguish for the three children and net accumulations." Metnick further requested an affidavit of no other insurance from David Fradley. (June 17, 2008 letter from Metnick to GEICO, Ex. 20, DE 70.) Additionally, in a letter dated June 23, 2008, the Estate requested proof of ownership of all vehicles in the Fradley household and reiterated that the Estate was demanding Fradley's total bodily injury policy limits per accident and any excess or umbrella coverage. (June 23, 2008 letter, Ex. 21, DE 70.)

On June 26, 2008, Cozad wrote to Tara, Mary, and David Fradley, advising them, among other things, that he had been retained by GEICO to represent them with regard to the Estate's claim. Cozad further advised them that McKnight was making a BI claim on the policy. Cozad explained that the most GEICO could pay on one claim was $100,000. Cozad also advised of the possibility of an excess judgment and recommended that the Fradleys consult personal counsel to discuss all issues of the case. Cozad forwarded a copy of this letter to Bill Tunkey. (Composite Ex. 22.) Also on June 26, 2008, Cozad wrote to Metnick, advising him that he had been retained to represent Tara, David and Mary Fradley. Cozad confirmed that GEICO had forwarded Metnick a copy of the Affidavit of Coverage and a certified copy of the policy. (June 26, 2008 letter from Cozad to Metnick, Ex. 23, DE 70.)

During this time period, GEICO attempted to contact Pierre regarding his injuries, learned that Hickman was injured in the accident, and also obtained information that McKnight had two doctors' appointments scheduled for her injuries. GEICO also investigated a possible claim to be made by Tara's boyfriend and passenger at the time of the accident. (Activity Log).

In a letter dated July 1, 2008, Cozad sent the Fradleys a copy of the police report and information regarding other possible claimants. (July 1, 2008 letter, Ex.24, DE 70.) In a letter

dated July 3, 2008, Cozad forwarded David, Mary, and Tara Fradley a copy of the Estate's July

23rd demand letter, which demanded GEICO's "total bodily injury policy limits per accident."

(July 3, 2008 letter,  Ex.25, DE 70.)   Cozad reiterated that the most GEICO could pay for

Prushansky's death would be $100,000 because the per person limits were only $100,000.  Cozad

further advised that GEICO intended to tender such amount prior to July 13, 2008.  Cozad also

outlined the Estate's additional outstanding demands, such as formal statements from the

Fradleys.  (July 3, 2008 letter,  Ex.25, DE 70.)

Metnick testified that, as of June 17, 2008, he was not yet in a position to accept

GEICO's tender of the $100,000.00 policy limits, as he needed to gather additional information.

(Metnick Dep. 33-34.)  As this was a wrongful death claim, he was proceeding cautiously and

wanted to ensure he had all the information he requested, particularly the existence of any other

insurance policy that might cover the loss. (Metnick Dep. 36.)  He also wanted information

regarding the circumstances under which Tara, a minor, had obtained the alcohol for the purpose

of imposing liability on any other potential tortfeasors. (Metnick Dep. 41-42, 55.)  Metnick

further stated that Tara's potential intoxication had no bearing on whether the Estate would settle

with GEICO for the $100,000.00 policy limits.  (Metnick Dep. 42-43.)   Cozad testified that he

did not expect Metnick to accept the tender of the policy limits when made, pending further

investigation, and that it was reasonable for Metnick to investigate the potential liability of

others. (Cozad Dep. 37-38, 66-67.)

In a letter dated July 7, 2008, Metnick again requested all information related to any

insurance policies held by the Fradleys, but this time he expanded the scope of the request to

include any business policies that the Fradleys might be insured under.   The Estate also

7

requested any test results from the date of the accident related to alcohol and/or narcotics in

Tara's system.[3]  (July 7, 2008 letter, Ex. 26, DE 70.)  On July 9, 2008, GEICO tendered a check

for the $100,000.00 per person policy limits to the Estate by way of hand-delivery.  (Composite

Ex. 27; Activity Log; Cathy Ruehl Dep. 10, Ex. 28, DE 70). A GEICO field representative

hand-delivered the $100,000 check, a proposed release,[4] and other documents required to meet

the Estate's requests, to Metnick's office. (Composite Ex. 27.)  Metnick signed a receipt for

delivery of the check and accompanying documents, but he made sure that GEICO understood

that he was not accepting the tender of the policy limits in exchange for a release of all claims

against the Fradleys, but was simply accepting delivery for his client pending a decision on

whether to accept tender and grant a release.  (Activity Log.)   In the cover letter accompanying

the release, GEICO advised that the release form enclosed with GEICO's tender package was a

proposed release.  GEICO further advised that not all release forms precisely fit the facts and

circumstances of each case and invited Metnick to send any suggested changes, additions or

---

[3] Metnick testified, however, that he knew from the outset that the State Attorney's Office
was investigating whether Tara had been driving under the influence. (Metnick Dep. 19, 41.)

[4] The release provided:

IN FURTHER CONSIDERATION of said payment, Releasor(s) agree to defend, protect,
indemnify and hold harmless Releasee(s) from any and every claim or demand, loss or
expense of every kind, which may ever be asserted by him/her/them, on his/her/their
account, or by anyone else, arising out of any bodily injuries sustained by Releasor(s) as
set forth above, and Releasee(s) shall be entitled to plead this obligation and this Release
in defense of any such claim. Releasor(s) specifically undertake and agree to defend,
indemnify and hold harmless Releasee(s) for any claims, demands, liens or assignments,
relating to medical care, diagnosis or treatment of Releasor(s), and any workers
compensation claims, demands or liens now pending, or which may be asserted in the
future, and any liens arising out of the legal obligation of Releasor(s).

(Release, Ex. 3, DE 71.)

deletions to the proposed release, or to provide GEICO with Metnick's own release form.
(Composite Ex. 27.)

Cozad testified that the purpose of an indemnity clause is to permit the insurer to look to the person who signed the release to indemnify them against any later assigned claims or liens from the settlement proceeds. (Cozad Dep. 31.)  The indemnity clause allows GEICO to shift its duty to defend against such a claim from itself to the releasor, the Estate. (Greg Santini Dep. 20-21, Ex. 1, DE 71; Gary Gertz Dep. 15-16, Ex. 2, DE 71.)

On July 15, 2008, Cozad advised GEICO that he had discussed the Estate's request for homeowners, business, and umbrella insurance information, as well as any blood alcohol and/or narcotics test results with his clients.  (July 15, 2008 letter, Ex. 29, DE 70.)  Cozad also wrote to Metnick on July 17, 2008 and advised, among other things, that the only coverage available to the Estate under the Policy was the $100,000.00 per person policy limits.  Cozad advised Metnick that it was Cozad's understanding that GEICO had already tendered the $100,000.   Cozad forwarded a copy of this letter to the Fradleys.  (July 17, 2008 letter, Ex. 30, DE 70.)  Under separate cover on that same day, Cozad also advised Metnick that the Fradleys did not have any umbrella policies available to them, and that Tara was not within the course and scope of employment at the time of the accident.  Cozad also confirmed GEICO's July 9, 2008 tender of the $100,000 policy limits and asked Metnick to call him upon receipt of the correspondence.  (July 17, 2008 letter from Cozad to Metnick, Ex. 31, DE 70.)   On July 18, 2008, GEICO forwarded Metnick a copy of Tara's driver's license application.  (Activity Log.) In a letter dated July 25, 2008, Cozad sent Metnick an executed Affidavit of No Other Insurance from Mary Fradley. (July 25, 2008 letter, Ex. 32, DE 70.)

9

At some point thereafter, GEICO settled a claim from McKnight, who eventually demanded $100,000.00.  Because multiple claimants remained and because GEICO had already tendered $100,000 to the Estate, GEICO worked to schedule a settlement conference so that GEICO could attempt to settle all the remaining claims within the applicable policy limits. (Activity Log.)  By the end of August of 2008, Metnick had conceded that he was mistaken and that the $100,000.00 per person rather than the $300,000.00 per accident limit was the coverage available under the GEICO policy. (Metnick Dep. 67; Cozad Dep. 80.)   On or around August 21, 2008, Metnick wrote to Cozad and requested that GEICO send a proposed release without the "indemnity language" present in the release.  (August 21, 2008 letter, Ex.  33, DE 70; Cozad Dep. 55, Ex. 34, DE 70.)  On August 22, 2008, Cozad advised GEICO of Metnick's request and asked GEICO for a copy of the release without the indemnity language. (August 22, 2008 letter, Ex. 35, DE 70; Cozad Dep. 56.)  In response to Cozad's letter, GEICO provided a copy of the release to Cozad the same day.  (August 22, 2008 facsimile, Ex. 37, DE 70; Cozad Dep. 57-58.) Cozad testified that he spoke with David Fradley sometime between August 21 and August 26, 2008 and he could not say for sure whether they discussed the release but that he "probably" said that Metnick was now requesting a release without the indemnity language. (Cozad Dep. 62-63.)

On or around August 26, 2008, as a follow-up to conversations with GEICO regarding the release, Cozad wrote to GEICO and advised that he would confirm with Metnick what specific portion of the release letter he wanted removed.  (August 26, 2008 letter, Ex. 38; DE 70; Cozad Dep. 60-61.)   On the same date, Cozad wrote to Metnick, requesting that Metnick confirm what portion of the indemnity clause he was referring to. (August 26, 2008 letter, Ex. 39; Cozad Dep. 64.)  Metnick confirmed same in correspondence dated August 28, 2008.  (August

28, 2008 letter, Ex. 40, DE 70.)  Cozad wrote to Killick, recommending that deletion of indemnity language is acceptable if the amended release is signed and the $100,000.00 tender is accepted. (August 26, 2003 letter, Ex. 3, DE 71; Cozad Dep. 77.)  Also on or about August 26, 2008, Cozad received correspondence from Metnick indicating that it had come to Metnick's attention that Tara was under the influence of alcohol and/or drugs at the time of the accident. (July 28, 2008 letter, Ex. 41, DE 70; Cozad Dep. 64-65.)  Cozad spoke to Mr. Fradley about this new information the same day. (Cozad Dep. 62-63.)

According to Cozad, when Metnick found out about this new information, he told Cozad that in light of this information, he could not accept settlement at this time, which Cozad described as a "blow" to the case. (Cozad Dep. 68-70.)   Kelly Killick, an insurance adjuster for GEICO, testified that when Metnick found out about the influence of alcohol and drugs, the settlement would not occur. (Killick Dep. 51.)  Michael Gilliom, a claims attorney for GEICO, testified that once Metnick knew about the alcohol and drugs the direction of the case changed. (Gilliom Dep. 66, Ex. 42, DE 70.)

On August 28, 2008, Cozad advised GEICO that Metnick had requested deletion of the entire indemnification language and that he was not in a position to accept $100,000.00 tender in light of the new information. (August 28, 2008 letter, Ex. 43, DE 70; David Fradley Dep. 50-52; Cozad Dep. 74-76.)  Cozad did not send a letter to Mitnick confirming this conversation. (Cozad Dep. 72-73.)   Cozad testified that Metnick knew that the Estate was only entitled to the per person policy limits. (Cozad Dep. 76.)  Cozad had recommended to GEICO that the indemnity language be removed, but the issue went "dormant" once Metnick said he was not in position to accept settlement. (Cozad Dep. 77-78.)   Thus, neither Cozad nor Killick sent a revised release to

11

Metnick. (Gilliom Dep. 62.)  Killick has no recollection whether she discussed the removal of the indemnity language with the Fradleys. (Killick Dep. 54.)  Cozad may have discussed it with the Fradleys. (Cozad Dep. 61-63.)   Cozad agreed that there was nothing preventing GEICO from sending Metnick a revised release removing the indemnity clause. (Cozal Dep. 78.)  Metnick testified that he never told Cozad that based on the new information regarding drug and alcohol use that he would not be in a position to accept the $100,000.00. (Metnick Dep. 76, 79.)  In fact, Metnick testified that Cozad advised him in August 2008 that GEICO was not willing to remove the indemnity language in the release. (Metnick Dep. 61-63.)

In September of 2008, GEICO changed the form of their release, upon the advice of counsel, to remove the indemnity language. (Santini Dep. 18-19, 21-22, 24-25.)  Thereafter, GEICO settled the claims of McKnight and Hickman, using the new release which did not include the indemnification clause. (Release of McKnight, Ex. 4, DE 71; Release of Hickman, Ex. 5, DE 71.)

On or about November 21, 2008, Janet Prushansky initiated a civil action against Tara and Mary Fradley for damages allegedly arising out of the June 10, 2008 automobile accident. (State court record,  Ex. 44, DE 70.)  Metnick testified that GEICO's failure to remove the indemnity clause and offer more than $100,000.00 was the reason for filing suit. (Metnick Dep. 71.)  GEICO advised the Fradleys that Cozad would be defending the case.  (Dec. 10, 2008 letter, Ex. 45, DE 70.)  On December 12, 2008, Cozad sent a letter of representation to Metnick's office, advising that Cozad had been retained to represent the Fradleys in the suit and would settle the case for the policy limits.  Cozad further advised that GEICO and the Fradleys could work with the Estate on any modifications to the release.  (Dec. 12, 2008 letter,  Ex. 46,

DE 70; Cozad Dep. 82-83.)

On December 17, 2008, GEICO contacted Cozad to ask if he needed anything from GEICO to assist in the defense. (Activity Log.)  Cozad and Metnick then had a telephone conversation in which Cozad asked Metnick why he filed suit and Metnick referred to the indemnity language and Cozak reminded Metnick that once the information regarding alcohol and drugs had been learned, Metnick had stated that he was not in a position to settle. (Cozad Dep. 86-87.)   Metnick testified that the suit was filed because of the indemnification clause and the delay had caused additional costs to be incurred. (Metnick Dep. 65.)

On December 24, 2008, Cozad wrote to Killick and advised her that Metnick had indicated that he filed suit because GEICO had not deleted indemnity language in the release. Cozad reminded Killick that in August 2008 he had recommended deletion of the language but because they had received a facsimile[5] from Metnick indicating that the Estate was no longer willing to settle due to the intoxication issue, the issue of the indemnity language was not addressed again because the Estate would not accept tender.  Cozad further advised that he had spoken to David Fradley and that he also recalled that the discussion regarding the "nuts and bolts" of the release had fallen by the wayside when the Estate decided not to accept the tender given the new information regarding Tara's intoxication.  Cozad further advised that he was recommending deletion of the language and that David Fradley was going to think about the issue and get a second opinion but would strongly consider Cozad's recommendation.  Cozad

---

[5] The facsimile states in relevant part, "It has come to our attention that Tara Fradley, a minor, was under the influence of alcohol and drugs at the time of the above incident.  Please advise where the alcohol/drugs were purchased and where they were consumed."  (Facsimile dated July 28, 2008, Ex. 41, DE 70-41.)

further asked that Killick "fast track" the issue so that he could advise Metnick that deletion of the language was acceptable.[6] (Dec. 24, 2008 letter, Ex. 47, DE 70.)

On the same day, Killick obtained permission to remove the indemnity language from the release. (Cozad Dep. 99-100; Kilick Dep. 63-64.) Cozad replied on December 29, 2008, advising Killick that David Fradley was getting a second opinion on removal of the language and that Cozad would advise him of GEICO's position. (Cozad Dep. 99-100.)

On January 6, 2009, Cozad emailed David Fradley, asking him to call regarding Cozad's recommendation that they delete the indemnity language in the release. The email also stated that GEICO had approved the deletion. (Cozad Dep. 100; Jan. 6, 2009 email, Ex. 48, DE 70.) On that same date, Cozad emailed David Fradley a copy of the release. (Jan. 6, 2009 letter, Ex. 49, DE 70.) The Fradleys approved the release modification. (Jan. 7, 2009 letter, Ex. 50, DE 70; Cozad Dep. 102-03.) On January 7, 2009, Cozad sent Metnick a copy of the modified release. (Jan. 7, 2009 letter from Cozad to Metnick, Ex. 51, DE 70.) Metnick advised his client not to accept the $100,000.00 offer. (Metnick Dep. 82, Ex. 52, DE 70.) On or around February 5, 2009, GEICO reissued the $100,000 tender to the Estate. Further, on or around March 18, 2010, GEICO reissued a third check to settle the Estate's claim. Thereafter, Metnick rejected GEICO's tender. (Activity Log.)

On September 14, 2010, GEICO received the Estate's Proposal for Settlement to Mary Fradley for $99,000. (Notice of Settlement Offer, Ex. 53, DE 70.) Thereafter, GEICO issued a check for $99,000.00 to settle the claim of the Estate against Mary Fradley. (Check, Ex. 54. DE 70.) This check was cashed, and GEICO received an executed release from the Estate of

---

[6] Cozad described this as a "cover your ass" letter. (Cozad Dep. 96-97.)

all claims against Mary Fradley on December 9, 2010.  (Mary Fradley Release,  Ex. 55, DE 70.)

On October 29, 2010, GEICO received the Estate's Proposal for Settlement to Tara Fradley for

$901,000.00.  (Activity Log.)  The case proceeded to trial and an Amended Final Judgment on

Jury Verdict was entered against Tara Fradley on July 12, 2011, in the amount of $2,150,000.

(Am. Final Judgment,  Ex. 56, DE 70.)

   After entry of the final judgment in the underlying action, GEICO initiated the present

declaratory judgment action, requesting a declaration that GEICO did not act in bad faith in

handling Prushansky's claim against Tara Fradley.  (Compl., DE 1.)

Defendant/Counter-Plaintiff, Janet Prushansky filed her Counterclaim for bad faith against

GEICO on August 24, 2012.  (Counterclaim, DE 20.)

   GEICO moves for summary judgment, claiming that no reasonable jury could find that it

acted in bad faith in handling the Estate's claim against Tara.  In so moving, Defendant argues

that, at all times, it was trying to settle the Estate's claim against the Fradleys and it had

reasonable opportunity to settle the claim.  Prushansky responds that GEICO's inclusion of and

unwillingness to remove the release's indemnity clause was done in bad faith and genuine issues

of material fact remain as to whether GEICO had no realistic opportunity to settle the claim.

   II.  Summary Judgment Standard

   The Court may grant summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant  is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The stringent burden of establishing the absence of a genuine issue of material

fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court

should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

16

III. Discussion

Under Florida law, "insurers have a common-law duty to exercise ordinary care and prudence in resolving their insured's liability." Valle v. State Farm Mut. Auto. Ins. Co., 394 Fed. App'x 555, 556 (11th Cir. Aug. 24, 2010) (citing Berges v. Infinity Ins. Co., 896 So.2d 665, 668-69 (Fla. 2004).  Insurers have a duty to refrain from acting "solely on the basis of their own interests in settlement." State Farm Mut. Auto Ins. Co. v. Laforet, 658 So. 2d 55, 58 (Fla. 1995). "This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980).  An insurer breaches this duty when it acts in a way that unreasonably fails to mitigate or unreasonably exacerbates the insured's exposure to liability. Id. (citing Perera v. U.S. Fidelity & Guar. Co., 35 So.3d 893, 904 (Fla. 2010)).  Bad-faith conduct by an insurer in settling a claim renders the insurer liable for a judgment against an insured for "any amount in excess of the insured's policy limits." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So.2d 55, 58 (Fla. 1995).  The "question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." Berges, 896 So.2d at 680.

An "insurer—acting with diligence and due regard for its insured—is allowed a reasonable time to investigate a claim . . . ." Johnson v. Geico Gen. Ins. Co., 318 Fed. App'x 847, 851 (11th Cir. Mar. 11, 2009).  But when "liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." Powell v. Prudential Prop. & Cas. Ins. Co., 584 So.2d 12, 14 (Fla. Dist.

Ct. App. 1991).

Whether "an insurer acted in bad faith generally raises an issue of fact for determination by a jury." Johnson, 318 Fed. App'x at 849-50; see also Berges, 896 So.2d at 680 ("Each case is determined on its own facts and ordinarily the question of failure to act in good faith with due regard for the interests of the insured is for the jury.") (internal quotation marks omitted); Campbell v. Gov't Emp. Ins. Co., 306 So.2d 525, 530-31 (Fla. 1974) ("[R]easonable diligence and ordinary care [are] material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact—not of law."). Summary judgment in bad-faith actions may nevertheless be appropriate "where the undisputed facts would allow no reasonable jury to conclude the defendant acted in bad faith." Johnson, 318 Fed. App'x at 850. "An insurance company's reliance on advice of counsel is a factor to be considered in bad faith cases." Kearney v. Auto-Owners Ins. Co., No. 8:06–cv–595–T–24TG, 2009 WL 3712343, at * 5 (M.D. Fla. Nov. 5, 2009) (citing Cotton States Mutual Ins. Co. v. Trevethan, 390 So.2d 724, 728 (Fla. Dist. Ct. App. 1980)); Westchester Fire Ins. Co. v. Mid-Continent Cas. Co. — F. Supp. 2d —, 2013 WL 3189053, at * 5 (S.D. Fla. June 21, 2013) (same).

The Court finds that there is a factual question regarding whether GEICO refused to remove the release's indemnity language. Metnick testified that Cozad told him that GEICO was unwilling to remove the indemnity language. Assuming the jury believes this testimony, it could find that the refusal to remove this language from the release demonstrates the failure of GEICO to act in good faith. This is particularly the case where an overreaching release is proposed, which also is a factual question for the jury to resolve in this case. Thus, summary judgment is inappropriate. See Otaola v. Cusano's Italian Bakery, 103 So. 3d 993, 997 (Fla. Dist. Ct. App.

18

2012) (an overreaching release can expose an insurer to a bad faith claim); United Auto Ins. Co.
v.  Estate of Levine, 87 So. 3d 782, 787 (Fla. Dist. Ct.  App. 2011) (affirming the denial of a
motion for a directed verdict for the insurer where the full policy limits were offered based on an
overreaching release, the insurer's "superficial" follow-up on the claim and the insurer's failure
to present expert testimony responsive to the experts provided by the claimant.)

   The cases relied upon by Defendant do not compel a different result.  While the Boateng
case rejected the plaintiff's claim of bad faith, it did so based on the insurer's prompt initiation of
settlement negotiations with the plaintiff and the plaintiff's failure to respond.  Boateng v.
GEICO General Ins. Co., No. 10–CIV–60147, 2010 WL 4822601, at * 5 (S.D. Fla. Nov. 22,
2010).  The fact that the insurer offered the plaintiff a check along with a release was not what
compelled the court's conclusion.  Id. at * 4.

   Likewise, in Novoa v. Geico Indemnity Co., No. 12-80223-CV, 2013 WL 172913 (S.D.
Fla. Jan. 16, 2013), aff'd, 2013 WL 5614269 (11th Cir. Oct. 15. 2013), the plaintiff alleged a
breach of the duty of good faith when, among other things, the insurer provided a release with a
check that covered the bodily injury claim and also released the property damage claims.  The
Court found that the insurer had acted quickly to evaluate the potential claims and offered the
claimant the full amount of coverage under the bodily injury section of the policy.  Id. at * 5.
The Court also held that the claimant was not misled by the "release's all-inclusive language
because she did not sign the release and subsequently communicated her claim for additional
compensation for property damage, to which the *[insurer] responded appropriately*."  Id. at * 6
(emphasis added).  Here, there is a factual question as to whether GEICO responded
appropriately regarding Metnick's complaint about the release.

19

Also relied upon by Defendant is  Cardenas v. GEICO Casualty Co., 760 F. Supp. 2d 1305, 1307 (M.D. Fla. 2011).  There, the claimant sought the policy limits and a release that did not include any "hold harmless or indemnity language."  The insurer tendered the policy limits and, while the release contained the "hold harmless or indemnity language," it advised that the claimant could submit proposed changes to the release.  Id. at 1308.  The claimant did not respond and the court held that the claimant could not rely on the release language to support a bad faith claim.  Id. at 1309.  In this case, there is a factual question as to whether Metnick responded by stating that the release was unacceptable.

Finally, in Kim v. GEICO Casualty Co., No. 2:09–cv–667–FtM–29DNF, 2011 WL 2218894 (M.D. Fla. June 7, 2011), the court found that no reasonable jury could find that the insurer acted in bad faith for failure to provide the claimant with a specific affidavit form requested by the claimant's attorney after the expiration of the settlement offer.  Id. at * 5.  Here, there is no basis to find that Metnick acted after the expiration of any offer.

Despite this authority, GEICO contends it is nonetheless entitled to summary judgment because it cannot be held responsible for the actions of its counsel who was retained to defend its insureds.  In support, GEICO relies on a line of cases that this Court finds inapposite.  In Aetna Cas. & Sur. Co. v. Protective Nat. Ins. Co. of Omaha, the court held that the insurer was not vicariously liable for the malpractice of the attorney it selected to defend its insured.  Aetna Cas. & Sur. Co. v. Protective Nat. Ins. Co. of Omaha, 631 So. 2d 305, 306 (Fla. Dist. Ct. App. 1993). In making that ruling, however, the Court was careful to distinguish the role of an attorney as trial counsel, wherein the attorney is an independent contractor, versus the attorney who performs business functions, and therefore acts as an employee for the insurer-employer.  Id.  In this case,

20

the Court finds there is a question of fact regarding whether Cozad acted as business counsel (and therefore an employee) who was engaging in a settlement negotiation, as opposed to an independent contractor, when dealing with the release.  Thus, the Court cannot determine, as a matter of law, that Cozad acted as independent counsel shielding GEICO from liability for his actions. See also Marlin v. State Farm Mutual Automobile Ins. Co., 761 So. 2d 380, 381 (Fla. Dist. Ct. App. 2000) (the insurer was not liable for attorney's malpractice who was retained to conduct litigation and therefore acted in the capacity of independent contractor).

Finally, taking the facts in the light most favorable to Prushansky, as the Court must, there is a factual question as to whether Geico was only negligent in the handling of the release or whether it acted in bad faith.   See Davidson v. GEICO, No. 8:09–cv–727–T–33MAP, 2010 WL 4342084, at *11 n.6 (M.D. Fla. Oct. 26, 2010) (bad faith is more than mere negligence) (citing Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980)); Maldonado v. First Liberty Ins. Corp., 546 F. Supp. 2d 1347, 1353 (S.D. Fla. 2008) ("the essence of an insurance bad faith claim is that the insurer acted in its own best interests ").

IV.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)      Defendant GEICO'S Amended Motion for Summary Judgment (DE 69) is

        **DENIED**.

2)      Defendant/Counter-Plaintiff's Motion for Leave to File Supplemental Authority

        (DE 87) is **GRANTED.**[7]

3)      Defendant/Counter-Plaintiff's Motion for Leave to File Supplemental Authority

        (DE 89) is **GRANTED.**

4)      Calendar call shall occur on March 21, 2014 for the two-week trial period

        commencing March 24, 2014.

        **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 6th day of January, 2014.

                                        _____
                                        KENNETH A. MARRA
                                        United States District Judge

---

[7] The Court is puzzled by GEICO's opposition to the filing of supplemental authority, given that GEICO itself filed supplemental authority after the briefing had concluded. See DE 91. Given that Prushansky did not violate the local rules by including a memoranda of law, there is no basis to deny the motions.